**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LISA SPRING-WEBER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 16 C 8097** |
| | ) | |
| **CITY OF CHICAGO, WILLIAM WONG,** | ) | |
| **and EDGAR IGNACIO SILVESTRINI,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Lisa Spring-Weber,[1] a fire paramedic employed by the City of Chicago, has

chronic Bell's palsy.  She has sued the City and two of its employees, Dr. William Wong

and Edgar Ignacio Silvestrini.  Spring's amended complaint asserts a dozen claims

spread across five counts:  (1) disparate treatment based on her disability in violation of

the Americans with Disabilities Act (ADA); (2) retaliation in violation of the ADA; (3)

discrimination in violation of the Rehabilitation Act; (4) violations of her constitutional

rights under the First, Fourth, Fifth, and Fourteenth Amendments; and (5) intentional

infliction of emotional distress.

The defendants previously moved to dismiss all five counts.  The Court orally

denied that motion on counts 1 and 2, *see* dkt. no. 47, denied it in a written opinion on

counts 3 and 5, *see Spring-Weber v. City of Chicago*, No. 16 C 8097, 2017 WL

---

[1] The Court will refer to the plaintiff as "Spring" because she and her counsel indicate that is her preference.

1316267, at *1 (N.D. Ill. Apr. 10, 2017), dkt. no. 55, and partially granted the motion on count 4, dismissing that count to the extent that its First, Fourth, and Fourteenth amendment claims were based on alleged confinement in a waiting room and alleged retaliation against Spring for communication with her Chicago alderman. *Id.* at *7.

The defendants have now moved for summary judgment on all of Spring's remaining claims. For the reasons stated below, the Court grants the motion.

## Background

The following facts are undisputed except where otherwise noted. Spring began work as a fire paramedic with the Chicago Fire Department in April 2004. In March 2009, she was diagnosed with chronic Bell's palsy. Spring suffers a number of related symptoms, including paralysis to the right side of her face, facial distortion and drooping, cosmetic disfigurement causing impaired speech and slurring, facial twitching, and impaired hearing. She experiences occasional flare-ups during which her symptoms worsen for a brief period. All parties agree with Spring's physician's assessment that Bell's palsy does not affect her fitness for duty as a paramedic, a role that demands reasoned judgment and routinely affects patients in life-or-death situations but does not require full use of facial muscles.

Spring also lives with an anxiety disorder. She was first diagnosed with anxiety at a young age and she was first prescribed medication for her condition when she was eighteen or nineteen years old. Spring's anxiety disorder manifests in acute episodes requiring a fast-acting medication to address symptoms. For years she has been prescribed Xanax for treatment of unexpected anxiety symptoms. She also occasionally uses the medication to help her sleep. But Spring reports that she "never"

took the medication while on duty because it appears on the Department's list of drugs prohibited from on-duty use and could inappropriately impair a paramedic's judgment. Defs'. LR 56.1 Stat., Ex. A, dkt. no. 94-2, at 41:14-18.  Finally, Spring has also been diagnosed with Attention Deficit/Hyperactivity Disorder (ADHD).  She is prescribed Adderall, an amphetamine subject to tolerance and dependence, to treat the condition. *Id.* at 42:10-44:9.

General Order 87-008 sets out the Department's policy against on-duty drug use. It states that "(1) [u]se, excessive use, or positive presence on duty, of illegal drugs or alcoholic beverages; (2) [e]xcessive use of legal drugs; [or] (3) [f]ailure to be fit for duty, in the opinion of two supervisors (one of whom shall be a Chief Officer of exempt rank), where there are reasonable grounds to suspect conduct prohibited in items 1 and 2 above" are "strictly prohibited."  Defs'. LR 56.1 Stat., Ex. D, dkt. no. 94-7, at 7 (Attach. 1).  The Department follows on-duty medication guidelines established by the National Fire Protection Association, which include a list of medications that can interfere with the performance of essential job tasks.  Defs.' LR 56.1 Stat., dkt. no. 94, ¶ 10.  The Department and Spring's union, the Chicago Fire Fighters Union, Local No. 2, jointly adopted limits for alcohol, illegal drugs, and listed medications that may appear in on-duty employees' systems.  Under the policy, Spring and other paramedics are required to report to a ranking officer if they suspect another employee of the Department is impaired on the job.  *Id.*

Spring's claims in the present lawsuit arise principally from one duty-related injury, three workplace incidents that resulted in Spring being subjected to so-called "fitness-for-duty" assessments, and the periods of involuntary medical leave that

followed those assessments. First, in May 2014, Spring suffered an injury to her right shoulder, neck, and arm while lifting a patient. Although she received emergency treatment for the injury, Spring alleges in her amended complaint that she was denied follow-up care because of her disability. *See* Am. Compl., dkt. no. 17, ¶¶ 91-100. She admits that she was referred to multiple specialists, but she was dissatisfied with the care she received and sought alternative treatment. Pl.'s Resp. to Defs.' LR 56.1 Stat., dkt. no. 103, ¶¶ 21, 23-27. Spring further admits that the reason she was denied care was that she did not obtain prior approval as required by the Department's medical section's guidelines. *Id.* ¶ 22. Despite the alleged denials of follow-up care, Spring ultimately reported "significant improvement" in January 2015 and indicated that she was ready to return to return to work in April 2015. *Id.* ¶¶ 28, 30. She was released for duty and returned to work at the end of that month.

The first of the three fitness-related incidents occurred on May 15, 2015, Spring's first day back on an ambulance after her injury. Spring was assigned to work with Paramedic-in-Charge Joel Weiss. Early in the day, Weiss entered an office where Spring was working and observed her "holding her head with her [] hand." Defs'. LR 56.1 Stat., Ex. G, dkt. no. 94-10, at 19:20-23. "It [] appeared" to Weiss that Spring "was either crying or sleeping." *Id.* at 21:23-24. But when he checked in with her, Spring told Weiss she was fine, and Weiss reported that "she acted appropriately after that." *Id.* at 19:22-23.

The rest of the morning was uneventful aside from Spring asking Weiss for directions to nearby hospitals, which he considered "odd" for a ten-year veteran who had previously worked in the area. *Id.* at 23:15-28:6. Then, early in the afternoon,

4

Spring was driving to a call with Weiss riding as a passenger when, according to Weiss, she veered suddenly to the right on a two-lane street, coming within two feet of the curb and entering a collision course with parked cars. *See* Defs.' LR 56.1 Stat, dkt. no. 94, ¶ 32. Weiss reported shouting at Spring in alarm. *Id.* He further testified that Spring's right eye was closed and that she appeared startled when he shouted. *Id.* She quickly corrected the ambulance's course and navigated back into the driving lane without further incident.

For her part, Spring denies that the episode ever occurred. Defs'. LR 56.1 Stat., Ex. A, dkt. no. 94-2, at 100:8. She asserts that Weiss misinterpreted an episode of Bell's palsy symptoms—including her apparently closed right eye—as evidence that she fell asleep at the wheel when, in fact, she was awake and alert the entire time. She further explains that she might, in the circumstances described, have maneuvered the ambulance to the right to avoid potholes in the street. *Id.* at 101:1-6. But when asked about this incident during her deposition, she denied having done that. *Id.* at 100:8-12.

Once Spring and Weiss arrived at the scene of the call, they learned they were on standby and thus did not have immediate work to do. Weiss took that opportunity to step away and report what he had observed to his supervisor, Paramedic Field Chief Dawn Dow, as required by Department policy. Dow then spoke to Spring for a few minutes, after which she directed Spring and Weiss to report to a nearby Department facility. Once they had arrived, Spring spoke to Dow and Assistant Deputy Chief Paramedic Sean Flynn. Flynn testified that Spring's behavior at the time was inappropriate, that her answers to his questions were "bizarre," and that she appeared sluggish and slow to respond. Defs.' LR 56.1 Stat., dkt. no. 94, ¶ 35. Based on her

behavior and Weiss's report—and consistent with a Department policy that requires two ranking officers to be present to make such an order—Dow and Flynn decided to test Spring's fitness for duty. Specifically, Spring underwent breathalyzer and urinalysis tests. She was put on involuntary paid medical leave—in Department parlance, she was "laid up"—pending the results.

On May 21, 2015, before the test results were available, Spring visited Dr. William Wong, the Medical Director of the Department's medical section. During that visit, Spring denied having fallen asleep or driven erratically. She asserted that her Bell's palsy had caused her eye to appear closed and that she had swerved to avoid potholes in the street.

When the results came back, they indicated a benzodiazepine (Xanax) level above the limit adopted by Spring's union and the Department. At a follow-up appointment on May 26, 2015, Dr. Wong registered his concern regarding Spring's medication regimen. He noted that that Spring's prescribed Xanax dosage had recently increased, that she had received prescriptions from three doctors in ten months, and that she had been filling the prescription every month despite reporting that she did not need the medication every day and was thus likely amassing a large quantity of the medication. He also noted that Spring reported sometimes taking the drug for sleep as well as for her anxiety symptoms. Considering Xanax's high risk of abuse and dependence, Wong concluded that a medication review was necessary and inpatient detoxification might become necessary in the future.

Wong ordered Spring to see an independent forensic psychiatrist, Dr. Alexander Obolsky, for further assessment. After meeting with Spring, Dr. Obolsky rendered his

report on October 21, 2015.  He opined that Spring's long-term Xanax use was "troublesome" in light of the medication's tendency to cause tolerance and withdrawal.  But he nevertheless concluded that Spring was fit for duty on the conditions that she (1) pursue treatment of her anxiety disorder by a psychiatrist and (2) the psychiatrist remain in communication with the Department about her condition and treatment.

Although she started seeing a psychiatrist a short time later, Spring initially declined to sign a medical release that satisfied the second condition of Dr. Obolsky's recommendation.  In November, she told Dr. Wong that she wished to share her perspective on her ongoing anxiety treatment and on the May 2015 incident with her psychiatrist before signing such a release.  She apparently did so and signed the release on December 4, 2015.  Spring was returned to duty on December 15.  For the period between the May incident and her return to duty in December, Spring was on involuntary medical leave, receiving full base pay but ineligible to earn overtime pay.

After her return in December, Spring worked for about a month without incident.  Then, in mid-January 2016, she was involved in a minor car accident—which the parties appear to agree was not her fault—on her way to work.  While the details of the accident are largely immaterial, the parties agree that Spring was shaken up by the ordeal.  After Spring arrived to work but before she was scheduled to be on duty, Field Chief Mercedes Nowinski contacted Assistant Deputy Chief Paramedic Mitchell Bartecki to inform him that there was "definitely something off about [Spring]."  Defs.' LR 56.1 Stat., dkt. no. 94, ¶ 47.  Nowinski noted that Spring was crying, irritable, not making much sense, and not in a state to perform her duties as a paramedic.  *Id.*  But before Bartecki and Nowinski proceeded further, Spring was called back to the scene of the car

accident by police. Bartecki and Nowinski decided, based on the circumstances, to assess Spring's fitness for duty when she returned.

According to Bartecki, when Spring returned to the station a couple of hours later she was still quite upset—crying, shaking, and attempting to drink water, soda, and coffee simultaneously. *Id.* ¶ 48. When they started talking, Bartecki testified, Spring was "irate, inconsolable, tearful, [and] agitated." *Id.* Spring denies that she was in any such state, though she says she may have been upset that she was being fitness-for-duty tested. She also points to Bartecki's contemporaneous notes, which do not express an opinion on whether she was intoxicated, Pl.'s Resp. to Defs.' LR 56.1 Stat., dkt. no. 103, ¶ 48, and to Bartecki's statements during his deposition that he did not notice the smell or similar "indicia" of alcohol or "drugs or marijuana" on Spring, Defs'. LR 56.1 Stat., Ex. I, dkt. no. 94-12, at 38:18-25. In any event, Spring was fitness-for-duty tested and again underwent breathalyzer and urinalysis tests.

Spring's urinalysis results far exceeded the limits adopted by the Department and her union. This time, she tested at thirty times the adopted limit for amphetamines (Adderall) and five times the limit for benzodiazepines (Xanax). Spring attributed these results to dehydration, which she alleges increased the concentration of chemicals in her urine. Wong and Spring's outside psychiatrist conferred about the results and agreed that her Xanax dosage ought to be reduced. Then, after about a month of medical leave, Spring provided letters from her psychiatrist and another physician attesting to her fitness for duty, and she was allowed to return to work on February 16, 2016.

Most of 2016 passed uneventfully for Spring. In November, she even received a

promotion from the Department, becoming a Paramedic in Charge. But then December brought the third and final fitness-related incident. Spring was working with fire paramedic Charles Schultz. Although Spring started the shift by telling Schultz that any odd behavior he observed was attributable to her Bell's palsy, Schultz noticed several things during their shift that he struggled to attribute to facial paralysis, and he grew increasingly concerned. First, Spring did not properly relieve the officer going off duty from the prior shift. Then she failed to properly record information in the firehouse record book. More concerning yet for Schultz, he observed Spring "dozing" and "nodding off mid-conversation" throughout the morning. Defs'. LR 56.1 Stat., Ex. J, dkt. no. 94-13, at 19:11-12. After their second run of the day, Spring fell asleep with a burning cigarette in her hand while preparing paperwork. Then, during their third run, while transporting a seriously injured patient, Spring erroneously made a rambling call on a citywide radio channel. People who heard the call described it as "all over the place," "somewhat bizarre," and "inappropriate." Defs.' LR 56.1 Stat., dkt. no. 94, ¶¶ 55, 57. Indeed, one listener thought Spring, who was administering patient care, sounded like a "happy drunk." *Id.* ¶ 57. But several listeners were careful to specify that, although unusual, Spring's speech was not slurred or heavily impeded, as one might expect from Bell's palsy symptoms. *Id.* ¶¶ 55, 57. Rather, it was the affect and content of the call that was abnormal. *Id.* Finally, after returning from the third call, Schultz testified that it took Spring nearly three hours to write only a few words of the incident report, though she disputed this testimony.

Several of Spring's superiors, including Paramedic Field Chief Derek Flowers and Assistant Deputy Chief Paramedic Robert Ertl, heard the errant radio call. Ertl

immediately contacted Schultz—who was with Spring on the ambulance—to ask him whether he believed Spring was fit for duty.  Schultz, who admitted during his deposition that he was not immediately certain that Spring was unfit, contacted Flowers to request a second opinion.  Flowers directed Spring and Schultz to return to headquarters.  Ertl and Flowers met them when they arrived.  Flowers described Spring as suffering from "a lot of brain fog" and noted his suspicion that she was "overmedicated" or experiencing medication side effects.  *Id.* ¶ 59.  Ertl described Spring as disheveled and unsteady on her feet.  *Id.* ¶ 60.  He further testified that, after a conversation with Spring, he concluded she was not fit for duty and should be fitness-for-duty tested. Flowers testified that he agreed with that assessment and that the condition he observed was beyond what could have been attributed to Spring's Bell's palsy.  *Id.* ¶ 59.

For her part, Spring vehemently denies much of Schultz's assessment.  Although she admits that many of the events Schultz described did, in fact, occur—including that she fell asleep with a cigarette in her hand while preparing paperwork—she suggests that each was caused by her Bell's palsy symptoms.  Specifically regarding the erroneous call, Spring notes that during his deposition Schultz agreed with Spring's lawyer's characterization of the call as a simple "mistake."  Pl.'s Resp. to Defs.' LR 56.1 Stat., dkt. no. 103, ¶ 55.  She further asserts that the listener descriptions can be attributed to misinterpretations of her Bell's palsy-related slurring.

Spring also contests parts of Flowers' and Ertl's accounts.  She alleges that Ertl had made up his mind that she was unfit for duty before he even spoke to her based only on the radio call.  Pl.'s Br. in Resp. to Defs.' Mot. for Summ. J., dkt. no. 102, at 2. She also notes that, during his deposition, Ertl could not conclusively rule out that Bell's

palsy contributed to the circumstances that led him to believe Spring was unfit. She next asserts that the unsteadiness Ertl described was simply a product of her having been startled when he walked up behind her. Pl.'s Resp. to Defs.' LR 56.1 Stat., dkt. no. 103, ¶ 60. Finally, Spring notes that Flowers was aware of her Bell's palsy and brought it up to Ertl as a possible contributing factor, but that Ertl was uninterested in considering "extenuating circumstances" in light of his and Flowers' shared assessment that Spring was unfit for duty. Defs'. LR 56.1 Stat., Ex. K, dkt. no. 94-14, at 19:6-23:6.

Regardless of how exactly these events played out, Spring's supervisors again doubted her fitness for duty and subjected her to urinalysis testing. And, as with previous fitness-for-duty assessments, Spring was placed on medical leave pending the results. This time, however, Spring had only a single day of paid medical leave remaining under the union's collective bargaining agreement, the exhaustion of which would have resulted in her termination. But instead of allowing her to lose her job, Spring's supervisors opted to reassign her to the Support and Logistics Division, where she would work until she had accrued additional leave days. Spring reported enjoying the assignment.

When the results came back from Spring's third round of drug testing, they once more showed levels of benzodiazepine (Xanax) and amphetamine (Adderall) exceeding the limits adopted by the Department and Spring's union. Spring again attributed the results to dehydration. Several months later in September 2017, once Spring had accrued more paid medical leave days, the Department's medical section directed her to see another independent physician, Dr. Susan Buchanan, concerning her urinalysis results and to assess whether she was fit to return to duty on an ambulance. Dr.

Buchanan concluded that Spring was fit for duty so long as she satisfied the conditions originally recommended by Dr. Obolsky in October 2015. That is, Spring's fitness was conditioned upon (1) pursuing treatment by a psychiatrist of her anxiety disorder and (2) allowing the psychiatrist to communicate with the Department about her treatment. As of the filing of defendants' motion for summary judgment, Spring was still employed by the Department but apparently had not yet met these conditions. The parties agree that she has started seeing a new psychiatrist and is being weaned off Xanax. But there is no indication in the record that she has otherwise taken steps to return to work. Furthermore, Spring's paramedic license expired at the end of 2017 and had not been renewed at the time of this motion.

Finally, Spring's claims also challenge the Department's medical leave policy. The parties agree that the Department's General Order 10-011 section III.D.6 requires "recuperating" employees on paid medical leave to generally remain at home during their time off. The purpose of the policy is to prevent fraud and abuse of the medical leave system. This policy generally limits those on paid medical leave from travelling and recreation, because the purpose of such leave is to allow employees to get better. Even so, the parties agree that waivers for travel and other activities are routinely granted when requested unless the underlying activity is deemed likely to hinder the employee's recovery.

The parties disagree, however, whether the policy applied to or was enforced against Spring. The defendants allege that Spring was not "recuperating" because she freely admits she was not recovering from an injury during any of the relevant periods of medical leave. Defs.' LR 56.1 Stat., dkt. no. 94, ¶¶ 68-69. Rather, Spring was awaiting

review of her fitness for duty. The defendants further note that Spring seems to admit that the policy was not strictly enforced against her; after all, the record suggests that she took her son on excursions without telling, or being scrutinized by, the Department's medical section. *Id.* ¶ 69. Spring, in contrast, alleges that the home confinement policy did, in fact, apply to her and that she followed it. Pl.'s Br. in Resp. to Defs.' Mot. for Summ. J., dkt. no. 102, at 15.

In sum, the defendants contend that Spring was thrice subjected to involuntary medical leave based on her supervisors' legitimate concerns that she was unfit for duty. They argue that, on each of the three relevant occasions, Spring behaved in ways that suggested she was impaired. The Department accordingly tested Spring for drugs and placed her on leave pending the results. And, the defendants emphasize, on each of these occasions Spring's urinalysis results indicated concentrations of chemicals identified as likely to impair judgment beyond the limits jointly adopted by the Department and Spring's union. The defendants contend that they went to considerable lengths to work with Spring, giving her multiple opportunities to correct her behavior and even reassigning her when she otherwise would have been terminated. Spring, on the other hand, contends that each of the incidents that led to her involuntary periods of medical leave was attributable to her colleagues misinterpreting her Bell's palsy symptoms or to their animus against her on the basis of her Bell's palsy.

### Discussion

Summary judgment is proper when the moving party "shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); see also *Poullard v. McDonald*, 829 F.3d 844, 852

(7th Cir. 2016).  On a motion for summary judgment, the Court draws reasonable inferences in favor of the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016).  In other words, "[s]ummary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Spring brought a dozen claims in a five-count amended complaint against the City of Chicago, Dr. William Wong, and Edgar Ignacio Silvestrini.  The defendants have moved for summary judgment on all five counts in Spring's amended complaint.  Count 1 alleges that the defendants subjected Spring to disparate treatment in violation of the ADA.  Count 2 alleges retaliation under the ADA.  Count 3 alleges discrimination in violation of the Rehabilitation Act.  Count 4 alleges several constitutional violations.  Finally, count 5 alleges intentional infliction of emotional distress under Illinois law.

Spring expressly waived a number of her claims in her response to the defendants' motion for summary judgment.  *See* Pl.'s Br. in Resp. to Defs.' Mot. for Summ. J., dkt. no. 102, at 12 n.3 ("To the extent that Plaintiff does not address a particular claim in Defendants' Motion, Plaintiff concedes Defendants' position with respect to that claim.").  The waived claims are: (1) the discrimination claim under the Rehabilitation Act (all of count 3); (2) the Fourteenth Amendment procedural due process claim in count 4; (3) the Fourteenth Amendment equal protection claim in count 4; and (4) all of the 42 U.S.C. § 1983 claims against Ignacio.  The Court concludes that several other claims were forfeited, as addressed individually below.

**A.     Spring's ADA claims**

Two counts in Spring's amended complaint present claims against the City under the ADA.  A third ADA claim appears to have been introduced for the first time in response to the City's motion for summary judgment.

**1.     ADA disparate treatment claim**

Spring alleges that she was subjected to disparate treatment on the basis of her disability in violation of the ADA.  To survive summary judgment, Spring must "point to evidence capable of establishing that (1) she is a person with a disability within the meaning of the ADA and Rehabilitation Act; (2) she is qualified to perform the essential functions of her job with or without a reasonable accommodation; and (3) she suffered from an adverse employment decision as a result of her disability." *Guzman v. Brown County*, 884 F.3d 633, 641 (7th Cir. 2018); *Arroyo v. Volvo Group N. Am., LLC*, 805 F.3d 278, 286 (7th Cir. 2015); 42 U.S.C. § 12112(a).  The first element—that Spring has a disability within the meaning of the ADA—is not disputed here.

Under the second element, the plaintiff must establish that she was a "qualified individual" at the time of the alleged disparate treatment.  *See Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 863 (7th Cir. 2005) (discussing the burden of proof in ADA discrimination claims); *Felix v. Wisc. Dep't of Transp.*, 828 F.3d 560, 568 (7th Cir. 2016) (articulating the standard in the analogous Rehabilitation Act context).  In assessing this factor, "courts undertake a two-part inquiry and consider whether, at the time of the termination decision, the employee: (1) satisfies the employer's legitimate selection criterion for the job; and (2) is capable of performing the job's 'essential functions' with or without reasonable accommodation from an employer." *Hammel*, 407

F.3d at 862; *see also Budde v. Kane Cty. Forest Pres.*, 597 F.3d 860, 862 (7th Cir. 2010).

To satisfy the third element—that she suffered an adverse action caused by her disability—a plaintiff must demonstrate that her employer "was not in fact relying on her conduct when it [took adverse action against] her but instead was animated solely by her disability." *Felix*, 828 F.3d at 572. A but-for causal relationship is probably required, though the Seventh Circuit has reserved the resolution of this question in light of a minor change to the statutory language. *See Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503-04 (7th Cir. 2017) (discussing the replacement of "because of" with "on the basis of" in the language of 42 U.S.C. § 12112(a)); *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961 n.1 (7th Cir. 2010) (discussing the revision).[2] In other words, the plaintiff must show that "the City would not have taken these adverse employment actions but for h[er] actual or perceived disability; proof of mixed motives will not suffice." *Hillman v. City of Chicago*, 834 F.3d 787, 795 (7th Cir. 2016) (internal quotation marks omitted). In making this assessment, "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

The Court need not determine whether Spring was a qualified individual because she has clearly failed to demonstrate causation. First, the City points to evidence in the record that suggests many of the individuals accused of discriminating against Spring on the basis of her disability were not, at the time, aware of it. Defs.' Br. in Supp. of

---

[2] Because Spring did not raise this argument, the Court applies existing Seventh Circuit precedent.

Mot. for Summ. J., dkt. no. 93, at 7; *see also Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995) (noting that an employer's agent did not commit ADA discrimination where he lacked knowledge of the employee's disability). More broadly, the City argues that each of the challenged fitness-for-duty tests was administered based on Spring's behavior that violated generally applicable policies. *Id.* at 7 (citing *Pernice v. City of Chicago*, 237 F.3d 783, 785 (7th Cir. 2001)). The City contends that such actions are not caused by an employee's disability within the meaning of the ADA's prohibition against discrimination.

Spring offers little in response beyond a conclusory statement that "genuine issue of material fact exist." Pl.'s Br. in Resp. to Defs.' Mot. for Summ. J., dkt. no. 102, at 2. Her most thorough response comes to the City's argument that many of those who chose to test Spring for fitness were unaware of her disability. Spring cites Derek Flowers' testimony in arguing that her Bell's palsy was "general knowledge" among her supervisors. *Id.* at 3-4, 9 n.1. But this contention does not withstand scrutiny. Although Flowers indeed testified that Spring's Bell's palsy was common knowledge "at [his] level," Defs.' LR 56.1 Stat., Ex. K, dkt. no. 94-14, at 12:8-10, it is clear from context that it only became widely known in November 2016 or later—long after the first two incidents that Spring alleges were discriminatory.

More fundamentally, though, Spring points to no evidence in the record from which a jury could conclude that on any of the three occasions her Bell's palsy—rather than her behavior—was a but-for cause of her supervisors' decisions to fitness-for-duty test her. Spring must point to such evidence in order to survive summary judgment. *See Guzman*, 884 F.3d at 641. Because she has failed to do so, summary judgment is

granted on the ADA disparate treatment claim.

### 2. ADA retaliation claim

It appears that Spring has forfeited her ADA retaliation claim by failing to address it at all in her summary judgment papers. But even if she had not forfeited the point, summary judgment in favor of the City would nevertheless be appropriate.

To withstand a motion for summary judgment, a plaintiff "must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the [defendants] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two." *Nicholson v. City of Peoria*, 860 F.3d 520, 523 (7th Cir. 2017); *see also* 42 U.S.C. § 12117(a) (providing that the "power, remedies, and procedures" set out in the retaliation provisions of Title VII apply to ADA retaliation claims); *Guzman*, 884 F.3d at 642.

The decisive factor is again causation. The City argues Spring has not adduced evidence sufficient to permit a reasonable jury to find that several of its agents accused of retaliation actually knew of her protected activities when they purportedly retaliated against her for them. *See* Defs.' Br. in Supp. of Mot. for Summ. J., dkt. no. 93, at 9 (citing *Guzman*, 884 F.3d at 641). It also points out a critical problem with Spring's alleged timeline: the protected conduct for which the City was purportedly retaliating against Spring—beginning with the EEOC complaint—occurred *after* the first two incidents that Spring alleges were retaliatory. *Id.* That is, the first two incidents occurred on May 15, 2015 and January 14, 2016, but the EEOC complaint was not filed until January 25, 2016. And, the City further argues, the third incident occurred long enough later—almost a year after the EEOC complaint and more than four months after

she filed this lawsuit—that but-for causation cannot, without more, reasonably be inferred. *See Turner v. The Saloon, Ltd.*, 595 F.3d 679, 690 (7th Cir. 2010) (holding that a two-month delay is too long, without more, to establish a causal connection sufficient to withstand summary judgment). Finally, in relation to all three incidents the City again argues that Spring has failed to adduce evidence from which a reasonable jury could find that her Bell's palsy was a but-for cause of the fitness assessments and corresponding periods of involuntary medical leave.

Spring does not address retaliation in her response to the motion to dismiss. Due to the utter absence of evidence beyond Spring's own conclusory assertion of a causal relationship between her Bell's palsy and her supervisors' decisions to test her fitness for duty, *cf. Dickerson v. Board of Trustees of Community College District No. 522*, 657 F.3d 595, 603 (7th Cir. 2011) (finding plaintiff's conclusory self-evaluation was "insufficient to permit [the] case to survive past summary judgment"), the Court grants summary judgment in favor of the City on this claim.

### 3.    ADA failure to accommodate claim

Spring alleges that the City failed to reasonably accommodate her disability. The ADA requires employers to provide reasonable accommodations to their employees who have disabilities that affect their ability to successfully do a job. But a claim for failure to accommodate—like any claim—must be made in a plaintiff's complaint. Generally speaking, assertion of an ADA discrimination claim does not tee up a claim for failure to accommodate if it does not mention a need or request for accommodation. *See Hooper v. Proctor Health Care*, 804 F.3d 846, 852 (7th Cir. 2015).

In this case, beyond simply saying nothing about accommodations, Spring

affirmatively abandoned her failure-to-accommodate claim by cutting it from her amended complaint. *Compare* Compl., dkt. no. 1, ¶¶ 60-67, *with* Am. Compl., dkt. no. 17. Further, the plain language of the amended complaint suggests that Spring did not contend that she needed an accommodation for her Bell's palsy in order to do her job. Am. Compl., dkt. no. 17, ¶ 81. The Court concludes that Spring has either waived or forfeited her failure-to-accommodate claim.

But even if Spring were still maintaining her failure-to-accommodate claim, it would fail. "To establish a claim for failure to accommodate, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005). As noted above, the test for assessing whether an employee is a "qualified individual" has two steps. *Brumfield v. City of Chicago*, 735 F.3d 619, 631-32 (7th Cir. 2013). The first step is precisely the same as in other ADA discrimination claims—"the individual must meet the employer's legitimate selection criteria." *Id.* at 632 (internal quotation marks and alterations omitted).

The second step, however, is meaningfully narrower. *Id.* The ADA's general anti-discrimination provision covers all individuals "capable of performing the job's essential functions *with* or *without* reasonable accommodation from an employer," capturing both "those who are able to perform the essential functions of the job even without reasonable accommodation, and those who could do so [only] if the employer were to make an accommodation for their physical or mental limitations." *Id.* (emphasis added). The reasonable accommodation provision's definition of "qualified individual,"

in contrast, captures only the latter category—"individuals who possess 'physical or mental limitations' but are '*otherwise* qualified' for the job." *Id.* (emphasis in original) (quoting 42 U.S.C. § 12112(b)(5)(A)). Stated differently:

> an employer need not accommodate a disability that is irrelevant to an employee's ability to perform the essential functions of her job—not because such an accommodation might be unreasonable, but because the employee is fully qualified for the job without accommodation and therefore is not entitled to an accommodation in the first place.

*Id.* at 632. But an employer may still be held liable for otherwise discriminating against its employee on the basis of such an unrelated condition. *Id.* at 631-32.

Here, like the plaintiff in *Brumfield*, Spring has failed to demonstrate that she required an accommodation to do her job—or, indeed, that her Bell's palsy was at all relevant to her ability to perform its essential tasks. In fact, as noted above, Spring's amended complaint suggests that she was able to do her job without the need for any accommodation. *See* Am. Compl., dkt. no. 17, ¶ 81. And in her deposition testimony, Spring stated that she was fully capable of performing the duties of a paramedic without accommodation. *See* Defs'. LR 56.1 Stat., Ex. A, dkt. no. 94-1, at 243:20-244:4, 310:3-11. When asked if her Bell's palsy hindered her performance of any "duty or function of a paramedic," Spring was unequivocal: "The deformity doesn't make you stupid. It means I can't control my face, it's the nerves. But I am 100 percent a damn good paramedic and my record reflects that." *Id.* at 243:20-244:4. Because Spring has admitted that her Bell's palsy imposes no obstacle to her ability to perform the essential duties of a paramedic, her failure-to-accommodate claim fails on the merits.

**B.      Spring's constitutional claims**

Count 4 of the amended complaint contains several constitutional claims. As

discussed above, Spring has expressly waived two of these claims, as well as all of her section 1983 claims against Ignacio. The remaining claims allege violations of the Fourth and Fourteenth Amendments by the City of Chicago and by Dr. Wong.

## 1. Fourth Amendment drug testing claim

Spring alleges that the City and Dr. Wong subjected her to unlawful searches by administering urinalysis drug tests without reasonable suspicion. "The Fourth Amendment protects an individual's reasonable expectation of privacy from intrusion by the state. Whether the individual has a reasonable expectation of privacy and whether the intrusion is reasonable are determined by balancing the claims of the public against the interests of the individual." *Div. 241 Amalgamated Transit Union (AFL-CIO) v. Suscy*, 538 F.2d 1264, 1267 (7th Cir. 1975). Typically, "[d]rug testing is a search within the meaning of the Fourth Amendment" and, "[a]s a general rule, [it] must be based upon individualized suspicion or wrongdoing to be considered reasonable." *Krieg v. Seybold*, 481 F.3d 512, 517 (7th Cir. 2007). The Court need not address the defendants' argument that Spring lacked a reasonable expectation of privacy because it is clear that the administration of urinalysis testing was reasonable under the circumstances presented here.

The defendants argue that the drug tests were supported by individualized suspicion. They note that Spring does not actually deny most of the events that led to her being tested on each of the three occasions. Rather, she asserts that "inappropriate judgments and conclusions were reached" by those around her based on her behavior and disability. Defs'. LR 56.1 Stat., Ex. F, dkt. no. 94-9, at 21 ¶ 12. The defendants also argue that Spring's admission that her supervisors genuinely believed she may

have been unfit when they chose to test her for fitness is dispositive. It then cites large, mostly undisputed portions of the record that outline the events that led to each test. Finally, it argues that even if there were a violation here, there is no basis for municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

Spring asserts that there are genuine issues of material fact regarding whether the mandatory drug tests she underwent were supported by reasonable suspicion. On this point, she offers a conclusory assertion that the defendants' contentions "simply [are] not" true. Pl.'s Br. in Resp. to Defs.' Mot. for Summ. J., dkt. no. 102, at 12. Spring also argues that the second drug test, which followed her January 2016 car accident, was particularly egregious. (She does not address the other two tests in her brief.) She contends without citation to the record that Bartecki, the individual directly responsible for the decision to test her for fitness on that occasion, testified that she exhibited no signs of impairment or drug use. Spring's arguments do not withstand scrutiny. Although the testimony is somewhat ambiguous, Bartecki did not testify that he affirmatively believed Spring to be unimpaired when he ordered her tested for fitness for duty. Rather, he testified that Spring did not smell of "drugs or marijuana or anything like that" or give similar "indicia that she had used drugs." Defs.' LR 56.1 Stat., Ex. I, dkt. no. 94-12, at 28:21-29:1. He also testified, however, that he "felt that [Spring] was not fit to get in an ambulance" based on her "irate, inconsolable, tearful, [and] agitated" state. *Id.* at 23:11-20.

In assessing the reasonableness of a search, a court balances the interests of the public and the individual. *Div. 241*, 538 F.2d at 1267. The parties in this case agree

that a paramedic's ability to safely perform her duties implicates patient safety in life-or-death circumstances.  The public's interest in maintaining a workforce of unimpaired paramedics is thus considerable.  In light of this public interest, no reasonable jury could conclude that the defendants violated Spring's Fourth Amendment rights by administering the disputed urinalysis tests.  Indeed, the record is devoid of evidence that would undermine the defendants' argument that the testing was based on reasonable suspicion arising from Spring's behavior.  For instance, in May 2015, Spring's supervisors chose to administer a drug test based both on her colleague's report that Spring had fallen asleep at the wheel of her ambulance, nearly colliding with a parked car, and on their own assessments of her impairment after speaking with her. The January 2016 incident, against which Spring marshals the most arguments, was based on Nowinski's report to Bartecki that there was "definitely something off about [Spring]," Defs.' LR 56.1 Stat., dkt. no. 94, ¶ 47, and Bartecki's own observations that Spring remained very upset hours after she had been involved in a minor car accident. Finally, the drug test that followed the May 2016 incident was undisputedly based on a radio call that Spring's supervisors heard and assessed to be inappropriate and indicative of impairment, and on an in-person conversation between Spring and her supervisors.

In sum, Spring has failed to produce evidence from which a reasonable jury could conclude that the disputed drug tests lacked reasonable suspicion.  Because she has failed to carry her burden, it is unnecessary to reach the reasonable expectation of privacy and *Monell* arguments.

## 2.    Fourth Amendment home confinement claim

Spring next alleges that the City and Dr. Wong subjected her to an unlawful seizure by confining her to her home during each of the periods she was on paid involuntary medical leave.  Specifically, she alleges that Department General Order 10-011 section III.D.6, which requires individuals on medical leave recuperating from an injury to remain at home and refrain from activities that could hinder their recoveries, made her "a prisoner in her own home."  *See* Am. Compl., dkt. no. 17, ¶ 102(d).

The defendants advance three main arguments in support of their motion for summary judgment.  First, they argue that the policy did not apply to Spring and that the Court should read the policy narrowly to avoid deciding an unnecessary constitutional question.  *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975).  Next, the defendants argue that Spring lacks standing to challenge the policy because she admits that she left home during her medical leave and because she was not subjected to the sort of surveillance and intimidation involved in *Pienta v. Village of Schaumburg*, 710 F.2d 1258 (7th Cir. 1983), a Seventh Circuit case arising from a factual context somewhat analogous to this case.  Finally, they argue that the burden imposed by the policy was so minimal that it did not present a constitutional violation.  In this regard, they note that all parties agree that waivers of the policy were routinely granted to employees who asked.

Spring argues that the defendants are attempting to avoid liability based on a technicality.  She contends that she was, in fact, "recuperating" within the meaning of the policy during each of her suspensions.  Spring suggests that to prevail on summary judgment, the defendants must establish that they did not expect or require her to

remain homebound during the three relevant periods of medical leave.

The parties offer the incorrect analytical framework. This claim arises under the Fourth Amendment (as incorporated by the Fourteenth), which among other things protects persons from unlawful seizure by the government. "A person has been 'seized' within the meaning of the Fourth Amendment if, in view of all of the circumstances surrounding the incident, a reasonable person would not have believed that he was free to leave." *Doe v. Heck*, 327 F.3d 492, 510 (7th Cir. 2003) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)); *see also California v. Hodari D.*, 499 U.S. 621, 637 (1991). The paradigmatic example of a seizure is, of course, an arrest. But a seizure does not occur when a government agent seeks to restrain a citizen merely through words if the citizen refuses to submit to the apparent show of authority. *See Hodari D.*, 499 U.S. at 626 ("The word 'seizure' . . . does not remotely apply [] to the prospect of a policeman yelling "Stop, in the name of the law!" at a fleeting form that continues to flee. That is no seizure."). Nor is there a seizure every time the government compels a person to be in a particular place. For instance, service of a summons to appear in court—even though it is backed by a court's power to hold the recipient in contempt and imprison her if she does not comply—does not amount to a seizure within the meaning of the Fourth Amendment. *See Bielanski v. County of Kane*, 550 F.3d 632, 639 (7th Cir. 2008) (reasoning that "a court appearance is less dramatic, less traumatic, than being arrested" (internal quotation marks omitted)).

Spring has not produced evidence supporting a reasonable inference that she was seized within the meaning of the Fourth Amendment. Based on the record here, Spring was at all relevant times free to leave her home. She even admits to having left

home despite the policy purportedly rendering her a prisoner.  *See* Pl.'s Resp. to Defs.' LR 56.1 Stat., dkt. no. 103, ¶ 69.  Under *Hodari D.*, even if a policy telling an employee to stay at home might in some circumstances amount to a seizure, Spring's noncompliance demonstrates the Department's policy did not.  In any event, Spring faced only the potential for employment discipline if she violated the policy—and even that is speculative, as the parties agree that waivers were routinely granted and that Spring never actually faced discipline under the policy.  *Id.* ¶ 68.  At no point did the alleged confinement approach even the modest liberty deprivation involved in the summons at issue in *Bielanski* or similar state action.

In short, Spring offers no evidence that she was deprived by the defendants of her ability to leave her home or otherwise seized.  Her Fourth Amendment claim based on the home confinement policy therefore fails.

### 3. Fourteenth Amendment psychological examination claim

Spring next claims that the City and Dr. Wong unconstitutionally violated her right to privacy by requiring her to submit to evaluation by a psychiatrist—and to sign a HIPAA release so that the psychiatrist could communicate with the Department's medical section—after she tested over the Department's adopted limits for benzodiazepine.  The privacy interest protected by the Fourteenth Amendment "includes a 'qualified' constitutional right to the confidentiality of medical records and communications."  *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 566 (7th Cir. 2009).  And although the Seventh Circuit has declined to determine whether ordering an employee to undergo psychiatric examination violates this right, *see Flynn v. Sandahl*, 58 F.3d 283, 290 (7th Cir. 1995), or to articulate what level of scrutiny alleged violations

ought to be subjected to, *Coffman*, 578 F.3d at 566, its reasoning in *Flynn* and *Coffman* is informative.

In *Coffman*, a firefighter alleged that she was subjected to a psychological evaluation without "legitimate reason" and that the decision therefore violated her substantive due process right to be free from arbitrary governmental action. *Id.* The Seventh Circuit disagreed, reasoning that the Indianapolis Fire Department's "decision to refer Coffman for the fitness for duty evaluations was not arbitrary—it was based on observations from multiple sources questioning Coffman's fitness for duty." *Id.* In *Flynn*, a corrections officer sought an injunction against a psychiatric examination, claiming that it would "force him to disclose confidential information and that this constitutes a violation of his right to privacy." *Flynn*, 58 F.3d at 289. Again, the Seventh Circuit took a different view, declining to determine conclusively whether the Fourteenth Amendment's privacy right protected public employees against psychological evaluations but holding that, even if it did, "this right must give way to considerations of the public interest." *Id.* at 290. The state had demonstrated, in the court's view, that there was an overriding interest in "maintaining a stable prison workforce" that clearly outweighed Flynn's privacy right. *Id.*

The defendants marshal similar arguments in this case. They point out that Spring's psychological evaluation was based on even more evidence than satisfied the court in *Coffman*—observations of her behavior by multiple colleagues as well as drug test results. The defendants also argue that the City has a compelling interest in ensuring the safety of the public and the well-being of the Department's workforce by pursuing mental healthcare for its employees analogous to the Department of

Correction's interest in *Flynn*. They further contend that the HIPAA release was required to ensure that Spring was receiving appropriate care, and that ongoing communication between Spring's psychiatrist and the Department's medical section was recommended by an independent physician, not by the medical section. Spring disagrees. She asserts that there remain genuine factual disputes on these points. She avers that "[e]mployees should simply not be subjected to this type of intrusion into their mental health in order to maintain their employment." Pl.'s Br. in Resp. to Defs.' Mot. for Summ. J., dkt. no. 102, at 13.

As in *Coffman*, Spring has failed to produce evidence from which a reasonable jury could find that the decision to subject her to psychological assessment was arbitrary. To the contrary, no reasonable jury could find that the decision was based on anything other than the numerous observations of Spring's behavior and drug test results described throughout the record. Spring has also failed to produce evidence from which a reasonable jury could conclude that the defendant's decisions to subject her to evaluation was not, as in *Flynn*, justified by a significant public interest. After all, the parties agree there is a considerable public interest in ensuring that paramedics, who often deal in life and death, are unimpaired and competent while on the job.

The Court therefore grants summary judgment in favor of the City and Dr. Wong on the psychological evaluation claim.

### 4. Section 1983 claims against William Wong

Spring's constitutional claims against Wong in his individual capacity fail for the same reasons as her parallel claims against the City. The Court grants summary judgment in favor of Wong on all of the remaining section 1983 claims against him.

**C.** **Intentional infliction of emotional distress claim**

In the fifth and final count of Spring's complaint, she alleges that the City, Dr. Wong, and Ignacio subjected her to intentional infliction of emotional distress (IIED) in violation of state law. A plaintiff must prove three elements to make out a case for IIED under Illinois law. "First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress." *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 269, 798 N.E. 2d 75, 80 (2003).

To satisfy the first element, conduct must be "so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Id.* at 270, 798 N.E. 2d at 80-81. For instance, the Illinois Supreme Court upheld an IIED verdict where an employer offered an employee money for sexual favors, fired her when she refused, threatened to rape and murder her, and threatened to file legal action to seize custody of her child. *Pavilon v. Kaferly*, 204 Ill. App. 3d 236, 246, 561 N.E.2d 1245, 1251-52 (1990). "In contrast, Illinois courts have denied recovery for distress resulting from recognizably reprehensible conduct which has been linked to an employer's legitimate interest." *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 568 (7th Cir. 1997).

Here, Spring has failed to produce evidence from which a reasonable jury could conclude that defendants' conduct was extreme and outrageous in the way required to sustain an IIED claim. In opposition to the motion for summary judgment, she focuses on the psychological evaluation, medical release, and medical leave policy. Pl.'s Br. in

Resp. to Defs.' Mot. for Summ. J., dkt. no. 102, at 16. But the drug tests and psychological evaluation were unquestionably linked to the City's legitimate interest in ensuring the safety of its workforce and the patients who find their lives in its paramedics' hands. *Cf. Van Stan*, 125 F.3d at 568. And, as the court discussed extensively above, there is no evidence that the Department's medical-leave policy was fully enforced against Spring. Even if it were, there is again no question that it was related to the Department's legitimate interest in avoiding fraud and abuse and encouraging recuperation during medical leaves.

Given the insufficiency of the evidence, Spring's conclusory assertion that "[t]here can be no question that defendants' actions were sufficiently 'extreme and outrageous' to afford Plaintiff the basis for an IIED claims [sic]," Pl.'s Br. in Resp. to Mot. for Summ. J., dkt. no. 102, at 16, is unavailing. The defendants are entitled to summary judgment on the IIED claim (count 5).

### Conclusion

For the reasons stated above, the Court grants the defendants' motion for summary judgment [dkt. no. 92] and directs the Clerk to enter judgment in favor of defendants and against plaintiff.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: September 26, 2018